1   GARY M. RESTAINO
    United States Attorney
2   District of Arizona
    TODD M. ALLISON
3   Assistant United States Attorney
    Arizona State Bar No. 026936
4   WILLIAM G. VOIT
    Assistant United States Attorney
5   Arizona State Bar No. 025808
    Two Renaissance Square
6   40 N. Central Ave., Suite 1800
    Phoenix, Arizona 85004
7   Telephone:  602-514-7500
    Email: Todd.Allison@usdoj.gov
8   Email: William.Voit@usdoj.gov

9   MATTHEW G. OLSEN
    Assistant Attorney General
10  United States Department of Justice
    National Security Division
11  CHRISTOPHER M. RIGALI
    District of Columbia Bar No. 1034475
12  Trial Attorney
    950 Pennsylvania Avenue, NW
13  Washington, DC 20530
    Telephone:  202-616-2652
14  Email: Christopher.Rigali2@usdoj.gov
    Attorneys for Plaintiff

15

16              IN THE UNITED STATES DISTRICT COURT

17                 FOR THE DISTRICT OF ARIZONA

18

    United States of America,            No.   CR-23-00770-PHX-DWL (MTM)
19
                   Plaintiff,
20                                               **I N D I C T M E N T**

21        vs.
                                         VIO:  18 U.S.C. § 371
22   1. Oleg Sergeyevich Patsulya; and,         (Conspiracy)
                                                Count 1
23   2. Vasilii Sergeyevich Besedin aka Vasiliy
        Besedin;                                18 U.S.C. § 554(a)
24                                              (Attempted Smuggling of Goods
                                                from the United States)
25                 Defendants.                  Count 2

26                                              18 U.S.C. §§ 4819(a)(1),
                                                4819(a)(2)(A)-(G), (J), 4819(b)
27                                              15 C.F.R. Parts 736.2(b)(1), (4), and
                                                (6), 746.8(a)(1)
28                                              (Conspiracy to Violate the Export
                                                Control Reform Act)
                                                Count 3

FILED ___ LODGED
___ RECEIVED ___ COPY

MAY 1 6 2023

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

REDACTED FOR
PUBLIC DISCLOSURE

18 U.S.C. §§ 1956(h), 1956(a)(2)
(Conspiracy to Commit Money
Laundering)
Count 4

18 U.S.C. §§ 981 and 982
21 U.S.C. § 853
28 U.S.C. § 2461(c)
50 U.S.C. § 4819(d)
(Forfeiture Allegation)

**THE GRAND JURY CHARGES:**

At all times relevant to this Indictment, unless otherwise indicated:

## Introduction

1.     As described in detail below, between at least May 2022 and continuing to on or about May 11, 2023, defendants OLEG SERGEYEVICH PATSULYA and VASILII SERGEYEVICH BESEDIN conspired with each other and with others known and unknown to the Grand Jury to evade United States export laws and regulations to send aircraft parts and components from the United States to Russia.  Specifically, after the United States imposed new license requirements on exports to Russia in February 2022 in light of Russia's further invasion of Ukraine, PATSULYA and BESEDIN developed a scheme through which they could profit financially from successfully shipping aircraft parts and components to Russian airline companies without the required licenses and authorizations by falsely representing the intended end user and final destination of the aircraft parts and components to be exported.

## Relevant Individuals, Companies, and Defendants

2.     MIC P&I, LLC ("MIC") was a Florida limited liability company with a principal place of business in Miami-Dade County, Florida.  At all times relevant to this Indictment, MIC was used by defendants OLEG SERGEYEVICH PATSULYA and VASILII SERGEYEVICH BESEDIN to perpetuate a scheme of purchasing export-controlled aircraft parts and components in the United States on behalf of Russian buyers.

3. The defendant, OLEG SERGEYEVICH PATSULYA ("PATSULYA") was a Russian national who resided in Miami-Dade County, Florida. PATSULYA represented himself to be the owner and operator of MIC. Additionally, he was listed on relevant corporate documents as the sole registered agent and sole authorized member of MIC.

4. The defendant, VASILII SERGEYEVICH BESEDIN aka VASILIY BESEDIN ("BESEDIN"), was a Russian national who resided in Miami-Dade County, Florida. BESEDIN represented himself to be an employee of MIC and at times represented himself to be the Vice President of MIC.

5. "Turkish Company 1" was a company operating in Turkey, which held itself out as an international freight-forwarding company. MIC, PATSULYA, and BESEDIN used Turkish Company 1 to conceal the fact that their true customers were companies located in Russia.

6. "Turkish Company 2" was a company operating in Turkey. MIC, PATSULYA, and BESEDIN used Turkish Company 2 to conceal the fact that their true customers were companies located in Russia.

7. "Russian Company 1" was a Russian company headquartered in Russia. Russian Company 1 held itself out as a company that sells aviation parts, tools, and equipment, and that also provides servicing and maintenance for aircraft.

8. "Russian Airline Company 1" was a Russian airline company headquartered in Russia. Russian Airline Company 1 was owned or controlled by Russia or a Russian national.

9. "Russian Airline Company 2" was a Russian airline company headquartered in Russia. On or about June 24, 2022, Russian Airline Company 2 was the subject of a United States Department of Commerce, Bureau of Industry and Security Order Temporarily Denying Export Privileges. The Order Temporarily Denying Export Privileges for Russian Airline Company 2 was renewed in another order published on or

about December 23, 2022.    Russian Airline Company 2 was owned or controlled by Russia or a Russian national.

10.    "Russian Airline Company 3" was a Russian airline company headquartered in Russia.  On or about May 25, 2022, Russian Airline Company 3 was the subject of a United States Department of Commerce, Bureau of Industry and Security Order Temporarily Denying Export Privileges.    The Order Temporarily Denying Export Privileges for Russian Airline Company 3 was renewed in another order published on or about November 21, 2022.    Russian Airline Company 3 was owned or controlled by Russia or a Russian national.

## The Statutory and Regulatory Background

### *The Export Control Reform Act and Export Administration Regulations*

11.    The Export Control Reform Act of 2018 ("ECRA") provided, among its stated policy objectives, that for a number of enumerated reasons, "[t]he national security and foreign policy of the United States require that the export, reexport, and in-country transfer of items, . . . be controlled . . . ."  50 U.S.C. § 4811(2).  To that end, the ECRA granted the President the authority to "control . . . the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by United States persons or by foreign persons." 50 U.S.C. § 4812(a)(1).

12.    The ECRA further granted the Secretary of Commerce the authority to establish the regulatory framework.  50 U.S.C. §§ 4812, 4813, 4810(10).  Pursuant to that authority, the United States Department of Commerce, Bureau of Industry and Security ("BIS") promulgated the Export Administration Regulations ("EAR"), Title 15, Code of Federal Regulations, Parts 730–774, to regulate the export of goods, technology, and software from the United States.

13.    Through the EAR, BIS reviewed and controlled the export of certain items from the United States to foreign countries.  *See* 15 C.F.R. Parts 734.2–734.3.  In particular, BIS placed restrictions on the export and reexport of items that it determined

- 4 -

could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States. The EAR imposed licensing and other requirements for items subject to the EAR to be lawfully exported from the United States or lawfully reexported from one foreign destination to another. Under the EAR, such restrictions depended on several factors, including the technical characteristics of the item, the destination country, the end user, and the end use of the item.

14. The most sensitive items subject to EAR controls were identified on the Commerce Control List ("CCL"), which was set forth in Title 15, Code of Federal Regulations, Part 774, Supplement Number 1. Items on the CCL were categorized by an Export Control Classification Number ("ECCN"), each of which has export control requirements depending on final destination, end use, and end user.

15. Under the ECRA, it was a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any regulation, order, license, or authorization issued pursuant to the ECRA or the EAR. *See* 50 U.S.C. § 4819(a)(1), (b). Furthermore, the ECRA prohibited the making of any false or misleading statement to BIS "in the course of an investigation or other action subject to the Export Administration Regulations." *See* 50 U.S.C. § 4819(f).

*Expanded Export License Requirements for Exporting Items to Russia*

16. On February 24, 2022, in response to Russia's invasion of Ukraine, the United States Department of Commerce imposed new license requirements on exports and reexports to Russia.

17. As of February 24, 2022, any item classified under any ECCN in Categories 3 through 9 of the CCL required a license to be exported to Russia. *See* Volume 87, Federal Register, Page 12,226 (published Mar. 3, 2022). As of April 8, 2022, the license requirement for export to Russia was expanded to cover all items on the CCL. *See* Volume 87, Federal Register, Page 22,130 (published Apr. 14, 2022). These rules were eventually

codified in Title 15, Code of Federal Regulations, Part 746.8, which stated, "a license is required, excluding deemed exports and deemed reexports, to export, reexport, or transfer (in-country) to or within Russia or Belarus any item subject to the EAR and specified in any Export Control Classification Number (ECCN) on the CCL."

18.     Any requests for licenses to export items on the CCL to Russia were reviewed under a policy of denial. *See* 15 C.F.R. § 746.8(b).

<em>Temporary Denial Orders</em>

19.     In addition to the licensing and other requirements imposed by the EAR, BIS had the authority to issue orders temporarily denying all of a party's export privileges to prevent an imminent violation. *See* 15 C.F.R. § 766.24. Under the ECRA and the EAR, it was a crime to take any action that is prohibited by a temporary denial order issued by BIS. *See* 50 U.S.C. §§ 4819(a)(1), 4819(a)(2)(J); 15 C.F.R. Part 736.2(b)(4)(i).

<em>The Commerce Control List Items</em>

20.     The Goodrich Main Landing Gear Brake Assembly, Part Number 2-1740-1 (the "Goodrich Brake Assembly"), was a carbon disc brake system that was used on Boeing 737 aircraft. At all times relevant to this Indictment, the Goodrich Brake Assembly was classified by BIS under ECCN 9A991.d ("parts" and "components," "specially designed" for "aircraft").

<em>Lack of Export Licenses and Authorizations for PATSULYA, BESEDIN, and MIC</em>

21.     At no time relevant to this Indictment had PATSULYA, BESEDIN, or MIC applied to the United States Department of Commerce for an export license or obtained any other export authorization to export airplane parts and components, including the Goodrich Brake Assembly, to Russia.

**COUNT ONE**
**Conspiracy to Commit Offenses Against the United States**
**(18 U.S.C. § 371)**

22.     The allegations contained in paragraphs 1 through 21 are realleged and incorporated herein as if fully set forth in this paragraph.

23.     Between at least in or about May 2022 and continuing to on or about May 11, 2023, in the District of Arizona and elsewhere, the defendants OLEG SERGEYEVICH PATSULYA and VASILII SERGEYEVICH BESEDIN, together with others known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate, and agree with each other and with others known and unknown to the Grand Jury, to commit the following offenses against the United States:

(a)     To knowingly and willfully export, attempt to export, and cause the exportation of goods, namely various airplane parts and components including but not limited to a Goodrich Brake Assembly (Part No. 2-1740-1), from the United States to Russia without having first obtained the required authorizations and licenses from BIS in violation of Title 50, United States Code, Section 4819(a), 4819(a)(2)(A)-(G), (J), and 4819(b); and Title 15, Code of Federal Regulations, Parts 736.2(b)(1), 736.2(b)(4), 736.2(b)(6);

(b)     To knowingly and fraudulently export and send and attempt to export and send from the United States merchandise, articles, and objects, namely airplane parts and components including but not limited to a Goodrich Brake Assembly (Part No. 2-1740-1), contrary to laws and regulations of the United States, including the Export Control Reform Act, Title 50, United States Code, Section 4819, and the Export Administration Regulations, Title 15, Code of Federal Regulations, Parts 730–774, and receive, conceal, buy, sell, and in any manner facilitate the transportation, concealment, or sale of the same merchandise, articles, and objects, prior to exportation, knowing the same to be intended for exportation contrary to such laws and regulations of the United States, in violation of 18 U.S.C. § 554(a); and

(c)     To defraud BIS by impairing, impeding, interfering with and obstructing, through deceit, craft, trickery, and dishonest means, a lawful governmental function, that is, the enforcement of laws and regulations prohibiting the export and supply of

goods from the United States to restricted entities and foreign destinations without a license or authorization, in violation of 18 U.S.C. § 371.

## Objects of the Conspiracy

24.     The objects of the conspiracy were:

25.     To acquire and obtain, on behalf of and for the benefit of Russian airline companies, including but not limited to Russian Airline Company 1, Russian Airline Company 2, and Russian Airline Company 3, some of which were the subjects of BIS-imposed temporary denial orders, export-controlled aircraft parts and components manufactured and sold in the United States;

26.     To conceal the prohibited export activities through various means—such as creating fake invoices and purchase orders, asserting false end-users in countries other than Russia, and having money from Russian airline companies go through bank accounts in other countries to conceal the source of the funds—to evade U.S. export laws and regulations;

27.     To deceive the United States government and to impair, impede, and obstruct the functions and operations of the BIS in the enforcement of export control laws and regulations administered by that agency so as to avoid penalties and disruption of the illegal activities;

28.     To successfully send from the United States export-controlled aircraft parts and components and ultimately supply those aircraft parts and components to Russian airline companies in Russia; and,

29.     To enrich members of the conspiracy through financial profit based on these illegal activities.

## Manners and Means of the Conspiracy

30.     The manner and means by which the objects of the conspiracy were to be accomplished included, but were not limited to, the following:

31.     The members of the conspiracy, with the intent to supply aircraft parts and components to Russian airline companies, solicited quotes from United States-based aircraft parts suppliers including but not limited to Arizona Company 1.

32.     The members of the conspiracy quoted and negotiated with representatives of Russian airline companies as to the fees and costs for delivering the requested aircraft parts and components to the Russian airline companies in Russia, such quotes and negotiations taking into account "sanctions" that had made it more difficult for the Russian airline companies to obtain the parts.

33.     The members of the conspiracy employed straw-buyer companies, including Turkish Company 1 and Turkish Company 2, and created misleading invoices naming the straw-buyer companies, to conceal MIC's actual customers and the true end-users of the aircraft parts and components.

34.     The members of the conspiracy used bank accounts associated with the straw-buyer companies and other foreign entities, such as Turkish Company 1, Turkish Company 2, and Russian Company 1, to receive payment from the Russian airline companies for the aircraft parts and components.

35.     The members of the conspiracy caused the money to be transferred from the foreign bank accounts to a MIC bank account in the United States.

36.     During negotiations with the United States-based aircraft parts supply companies, including but not limited to Arizona Company 1, the members of the conspiracy made materially false and fraudulent representations about the identity of their clients and the intended end destinations of the requested parts and components.

37.     In connection with their attempts to acquire aircraft parts and components, the members of the conspiracy traveled to the United States-based aircraft parts supply companies' facilities, including but not limited to Arizona Company 1.

38.     During the negotiations, the members of the conspiracy filled out export compliance forms affirming that they would comply with all United States export laws

and regulations, including by obtaining any necessary licenses and authorizations, and would not sell, transfer, and export the aircraft parts and components to restricted countries, including Russia, or to prohibited individual entities.

39. The members of the conspiracy arranged for shipments of the parts and components from the United States to transshipment points in various countries for which export licenses and authorizations were not required under United States export laws and regulations, and then falsified, and caused others to falsify, export and shipping records to reflect companies located at those transshipment points, including but not limited to Turkish Company 1 and Turkish Company 2, as the ultimate end users.

40. The members of the conspiracy used the funds from the Russian airline companies, absent fees that members of the conspiracy kept for themselves as profit, to pay the United States-based aircraft parts supply companies.

41. When shipments of the parts and components were detained by United States government agencies, the members of the conspiracy knowingly made material misrepresentations to, and concealed material facts from, United States government officials with BIS and United States Customs and Border Protection ("CBP") both in written submissions and in in-person interviews to deceive those government agencies and continue to try to evade export controls to perpetuate their scheme.

**Overt Acts in Furtherance of the Conspiracy**

42. In furtherance of the conspiracy, and to effect and accomplish the objects thereof, PATSULYA and BESEDIN, and others known and unknown to the Grand Jury, committed various overt acts within the District of Arizona and elsewhere, including but not limited to the following:

43. Beginning on or around May 31, 2022, PATSULYA started communicating via email with various Russian companies, including Russian Airline Company 1, about supplying the companies with various aircraft parts and components, including the Goodrich Brake Assembly.

44.     In June and July 2022, PATSULYA and BESEDIN signed up for multiple online procurement marketplaces that specialized in purchasing and selling aircraft parts and components, through which PATSULYA and BESEDIN planned to identify U.S.-based and international companies who had inventory of the specific aircraft parts and components.

45.     On or about June 28, 2022, a representative from Russian Airline Company 1 emailed PATSULYA an updated list of aircraft parts and components that Russian Airline Company 1 was seeking to acquire. The list included two units of the Goodrich Brake Assembly. That same day, a representative from Russian Airline Company 1 emailed PATSULYA "Dear Oleg, Due to the contemplation of business, please forward me the following documents . . ." and asked PATSULYA for various corporate, ownership, and tax documents for Turkish Company 1.[1]

46.     On or about July 14, 2022, PATSULYA, purportedly on behalf of Turkish Company 1, responded to the June 28 inquiry from Russian Airline Company 1. PATSULYA provided a quote for the delivery (to Moscow) of various aircraft parts and components, including two units of the Goodrich Brake Assembly. PATSULYA quoted a cost of $102,060 dollars per unit of the Goodrich Brake Assembly.

47.     On August 31, 2022, PATSULYA emailed a representative of Russian Airline Company 3 seeking to secure Russian Airline Company 3 as a new customer. In the email, PATSULYA stated that his "group of companies" already had several Russian customers, including Russian Airline Company 1 and the Russian Federation's Ministry of Defense. In the email, PATSULYA wrote,

---

[1] Many email communications referenced herein were written in the Russian language. Unless otherwise indicated, all quoted communications from emails from containing the Russian language are taken from translations of the original written Russian communication, and are in presented in substance and effect.

Hello [Representative of Russian Airline Company 3],

A group of companies comprising US-based MIC-P&I, LLC (Miami, Florida), [Turkish Company 1], [Russian Company 1] Russian Federation, is offering you the procurement of aviation parts, electronic components, and units for various types of aircrafts.

Our group of companies supplies goods to such companies as [Russian Airline Company 1 and other companies in Russia], affiliates of the Ministry of Defense of the Russian Federation, and [an additional company in Russia].

It works like this:

You sign a contract with [Russian Company 1] for delivery terms DDP Moscow, or with [Turkish Company 1] for delivery terms DAT Moscow. You make a prepayment in accordance with the contract, after which we deliver the goods to you within the agreed upon timeframe.

In light of the sanctions imposed against the Russian Federation, we have been successfully solving challenges at hand. Please consider us as an integrated supplier of goods for [Russian Airline Company 3].

Respectfully,

Oleg Patsulya

48.     Between July 2022 and September 2022, PATSULYA and BESEDIN used multiple online marketplaces to submit requests for quotes to United States-based and international aircraft parts supply companies, including but not limited Arizona Company 1, for various aircraft parts and components, including for the Goodrich Brake Assembly.

49.     In response to one of PATSULYA's requests for quote for an aircraft part, the United States-based aircraft parts supply company responded with a generic, automated email disclaimer which stated that, because of the Russian invasion of Ukraine, the company would not action any request from any party located in Russia or where the end user is located in Russia.   Upon receiving the automated email, PATSULYA forwarded the email to another individual, stating, "Do not write to these freaks."

- 12 -

*Attempted Purchase of Multiple Units of the Goodrich Brake Assembly from Arizona Company 1 for Export to Russian Airline Company 1*

50.     In response to one of BESEDIN'S requests for a quote to purchase seven units of the Goodrich Brake Assembly, on or about August 8, 2022, a representative from Arizona Company 1 informed BESEDIN that Arizona Company 1 had two overhauled Goodrich Brake Assembly units in stock (serial numbers 6343 and 6350) and would look for the other five units requested by BESEDIN, and Arizona Company 1 would sell each of the seven units for $65,000 each.  The same day, PATSULYA, holding himself out as a representative of Turkish Company 1, emailed a representative of Russian Airline Company 1, offering the exact same two units of the Goodrich Brake Assembly (serial numbers 6343 and 6350) for delivery to Moscow, one at $78,599 and the other at $82,400. PATSULYA later advised Russian Airline Company 1 that he could deliver the two sets of brakes within 20 days of the date that the money was delivered to PATSULYA's bank account.

51.     On or about August 11, 2022, BESEDIN emailed Arizona Company 1's representative and requested quotes for brakes with less wear. In response to Arizona Company 1 offering to sell BESEDIN seven units of the Goodrich Brake Assembly with less wear for $74,998.98 each, PATSULYA emailed Russian Airline Company 1 and offered to supply two units of the Goodrich Brake Assembly for $105,000 each with delivery to Moscow.  In his email to Russian Airline Company 1, PATSULYA specifically referenced the serial number of one of the brake assemblies offered by Arizona Company 1 (serial number 6350).

52.     After receiving an email on or about August 16, 2022, from Russian Airline Company 1 containing a purchase order for two units of the Goodrich Brake Assembly, PATSULYA emailed Russian Airline Company 1 an invoice (No. PI-0017-022) to sell two units of the Goodrich Brake Assembly at $105,000.00 each for a total of $210,000.00, minus a credit of $62,140.50 from a prior transaction.  The invoice was on letterhead from

Turkish Company 1 and contained account information for a Turkish bank account belonging to Turkish Company 1.

53. The next day, Russian Airline Company 1 wired $147,859.50 from a bank account belonging to Russian Airline Company 1 in St. Petersburg, Russia, to Turkish Company 1's Turkish bank account. Later, on or about August 22, 2022, MIC's bank account in the United States received a wire from Turkish Company 1 in the amount of $140,366.53. The wire notes referenced the corresponding invoice number (No. 0017-22).

54. On or about August 18, 2022, BESEDIN emailed the representative from Arizona Company 1 and said, "I'm ready to order all 7 these [sic] parts, But I want to ask you to give me a better price so we can get closer to our request . . . ." After the Arizona Company 1 representative advised BESEDIN that the lowest price they could offer was $70,000 each, BESEDIN responded, "Ok, I'll talk to management and get back to you shortly."

55. The next day, on or about August 19, 2022, BESEDIN emailed Arizona Company 1 a purchase order for seven units of the Goodrich Brake Assembly. The purchase order reflected an offer to purchase the seven units for $70,000 each, for a total of $490,000. The purchase order listed Arizona Company 1 as the seller and listed a "ship to" address of MIC-P&I, LLC in Sunny Isles Beach, Florida. In the email, BESEDIN also asked the Arizona Company 1 representative to send him the "Technical Summary Report of these parts."

56. On or about August 22, 2022, the Arizona Company 1 representative emailed BESEDIN that Arizona Company 1 had five units of the brake assembly ready to sell, two of which had very little wear, and attached paperwork related to each of the five units (serial numbers D0064P, 4774, 6580, 3316, and 3419). After receiving the paperwork, BESEDIN emailed it immediately to PATSULYA, and PATSULYA in turn emailed it to Russian Airline Company 1.

57.     That same day, Arizona Company 1 emailed BESEDIN a document titled, "Certificate of End-User and Export Control," and asked BESEDIN to complete the document prior to shipment. The document contained a variety of acknowledgements, described below, pertaining to compliance with U.S. export laws and regulations. BESEDIN later emailed the export compliance form to PATSULYA. PATSULYA later forwarded the email and directed that Arizona Company 1 be contacted by another person.

58.     On or about August 23, 2022, PATSULYA emailed an invoice (No. PL-0018-022) to Russian Airline Company 1 referencing the purchase of five more units of the Goodrich Brake Assembly for $103,000 per unit. The invoice was on Turkish Company 1's letterhead and contained account information for a Turkish bank account. The same day, Russian Airline Company 1 emailed PATSULYA and confirmed the purchase of the five additional units of the Goodrich Brake Assembly through a purchase order.

59.     After Russian Airline Company 1 confirmed the purchase, BESEDIN emailed Arizona Company 1 and said, "[W]e are definitely taking these 2 and waiting for the rest, as you said they will arrive within 2 weeks, right?" BESEDIN also told Arizona Company 1 that "we would like to come to your wearhouse[sic] to buy these parts and at the same time get to know each other for further interaction."

60.     On or about August 25, 2022, MIC confirmed via email its "intention to buy the order," and PATSULYA and BESEDIN caused materially false information to be provided to Arizona Company 1, namely that the units of the Goodrich Brake Assembly that BESEDIN and PATSULYA sought to acquire were for customers in Turkey.

61.     Attached to aforementioned email was Arizona Company 1's "Certificate of End-User and Export Control" form, which was signed by PATSULYA on behalf of MIC. By signing the form, PATSULYA acknowledged and agreed: (a) the parts being purchased from Arizona Company 1 "are subject to Export Control Laws and Regulations, including, without limitations, the EAR and ITAR."; (b) that MIC would "not . . . export[],

- 15 -

release[], or disclose[] [the parts and/or technology purchased from Arizona Company 1] to foreign nationals inside or outside the United Sates without first complying with all applicable Export Control Laws and Regulations"; (c) that MIC would not export or re-export parts "to any restricted/embargoed country as may be designated from time to time by the United States Government"; (d) that United States laws "prohibit the sale, transfer, export, re-export to, or participation in any export transaction . . . with individuals or companies listed in the U.S. Department of Commerce's Denied Persons List . . . ."; (e) that MIC "will obtain any export licenses or prior approvals required by the United States Government prior to export or re-export . . . ."

62.     On or about August 30, 2022, Russian Airline Company 1 wired $515,000 from a bank account held at a bank in St. Petersburg, Russia, to a bank account belonging to Turkish Company 1 in Antalya, Turkey. Russian Airline Company 1 emailed PATSULYA proof of this payment for the brakes. The proof of payment referenced the same invoice number (No. PL-0018-022) that PATSULYA had previously sent Russian Airline Company 1.

63.     On or about September 1, 2022, BESEDIN emailed the Arizona Company 1 representative and asked him to "confirm the presence of the brakes we need, in what quantity . . ." and told the representative that he and PATSULYA would fly out to visit Arizona Company 1 the following week.

64.     On or about September 7, 2022, PATSULYA and BESEDIN traveled from Florida to Phoenix, Arizona for the purpose of meeting with representatives of Arizona Company 1.

65.     On or about September 7, 2022, PATSULYA emailed multiple spreadsheets to the Arizona Company 1 representative. One of the spreadsheets was titled "Trams Phoenix.xlsx," and another spreadsheet was titled "Algovictory air Phoenix.xlsx." The spreadsheets listed various aircraft parts and components along with part numbers and quantities.

66.     On the morning of September 8, 2022, PATSULYA and BESEDIN visited Arizona Company 1's facility. During the visit, PATSULYA and BESEDIN made material misrepresentations to representatives of Arizona Company 1 including that they would not be supporting any Russian customers. Rather, PATSULYA and BESEDIN told representatives of Arizona Company 1 that the brakes they wanted to purchase from Arizona Company 1 would be going to Turkey.

67.     During the visit, PATSULYA and BESEDIN told representatives of Arizona Company 1 that they would be interested in trying to purchase more of the parts that were listed in the spreadsheets that PATSULYA had previously emailed. When the representative of Arizona Company 1 asked about the titles of the spreadsheets, PATSULYA and BESEDIN told him that the titles were simply internal notes.

68.     On September 9, 2022, PATSULYA emailed himself a consolidated spreadsheet that included the identical lists of parts contained in the spreadsheets, titled "Trams Phoenix.xlsx" and "Algovictory air Phoenix.xlsx." In the version of the spreadsheet that PATSULYA emailed himself, however, the list of aircraft parts that had been contained in the spreadsheet titled "Trams Phoenix.xlsx" was instead noted as Russian Airline Company 1. The list of aircraft parts that had been contained in the spreadsheet titled "Algovictory air Phoenix.xlsx" was instead noted as Russian Airline Company 2.

69.     On or about September 15, 2022, PATSULYA transmitted two invoices showing transactions between MIC and Turkish Company 1—one invoice, bearing Invoice No. PI-0052-22, reflected MIC's sale of three units of the Goodrich Brake Assembly to Turkish Company 1 for $97,800 each (for a total of $293,400.00), and the other invoice, bearing Invoice No. PI-0053-22, reflected MIC's sale of two units of the Goodrich Brake Assembly to Turkish Company 1 for $97,800 each (for a total of $195,600.00).

70.     On or about September 20, 2022, MIC's bank account in the United States

1    received a wire from Turkish Company 1 in the amount of $293,378.00. The notes
2    associated with the wire reference that the wire was for "Inv. No. Pi-0052-22."

3    71.    On or about September 21, 2022, MIC's bank account in the United States
4    received a wire from Turkish Company 1 in the amount of $195,578.00. The notes
5    associated with the wire reference that the wire was for "Inv. No. Pi-0053-22."

6    72.    On or about September 15, 2022, BESEDIN and PATSULYA, and others
7    known and unknown to the Grand Jury, emailed a representative of Arizona Company 1
8    and inquired about the contemplated brake transaction.

9    73.    On or about September 20, 2022, PATSULYA sent another text message to
10   the Arizona Company 1 representative via WhatsApp in which he said, "[H]ow are you?
11   I really hope to receive an Invoice for my order for brakes 2-1740-1 from [Arizona
12   Company 1] at the price we agreed on."

13   74.    On or about September 25, 2022, PATSULYA sent another text message to
14   the representative of Arizona Company 1 via WhatsApp in an effort to finalize the deal
15   for the seven brake assemblies. In the text message, PATSULYA stated, "We have
16   negotiated with you the purchase of the 7 brakes and we have agreed the[sic] conditions
17   of the deal. To this day we are still waiting for you to send us the proform[invoice], in
18   order to make the payment. With much respect, we await your response."

19   75.    Between on or about September 27, 2022, and to at least October 2022,
20   BESEDIN, and PATSULYA continued to submit requests for quotes to Arizona Company
21   1 for additional units of the Goodrich Brake Assembly as well as other aircraft parts and
22   components.

23   _Purchase of Multiple Units of the Goodrich Brake Assembly from New York_
24   _Company 1 and Attempted Export to Russian Airline Company 1_

25   76.    After BESEDIN and PATSULYA were ultimately unable to secure any units
26   of the Goodrich Brake Assembly from Arizona Company 1, they continued to try to obtain
27   the part from other United States-based airplane parts supply companies.

28

77.     In October and November 2022, BESEDIN and PATSULYA worked directly with a company based outside of the United States in an effort to find, acquire, and ultimately export from the United States multiple units of the Goodrich Brake Assembly.

78.     On or about November 10, 2022, the company based outside of the United States sold two units of the Goodrich Brake Assembly to MIC for $121,000.00 per unit, plus a management fee of $12,100.00 for a total of $254,100.00.

79.     To fulfill this sale to MIC, on or about November 10, 2022, the company outside of the United States purchased two units of the Goodrich Brake Assembly from New York Company 1 for $121,000.00 each for a total of $242,000.00.  New York Company 1 had, in turn, secured the two sets for brakes from California Company 1.  The invoice for the transaction reflected that, although the company outside of the United States had purchased the two units of the Goodrich Brake Assembly, the two units were to be shipped to MIC in Florida.

80.     On or about November 14, 2022, BESEDIN and PATSULYA caused $254,100.00 to be wired from MIC's bank account to a bank account belonging to the company based outside of the United States.

81.     On or about November 18, 2022, a representative from California Company 1 emailed BESEDIN and advised that there were 2 crates for pickup in the State of Texas. The subject line of the email was "Pickup Brakes PN 2-1740-1." On or about November 21, PATSULYA emailed an individual who worked for a freight forwarding company and provided him with the pickup address in Texas for "Brake 2-1740-1."

82.     Between on or about November 22, 2022, and November 23, 2022, BESEDIN traveled from Florida to Texas to inspect the two brake units, which were being held by Texas Company 1.

83.     On November 23, 2022, the freight forwarding company retained by PATSULYA picked up the brake units in Texas, and afterwards, a representative from

Texas Company 1 emailed BESEDIN and PATSULYA and provided them with a Bill of Lading for the two sets of the Goodrich Brake Assembly. The Bill of Lading reflected that the cargo was being delivered to Maldivian Company 1 in the Maldives. The next day, PATSULYA forwarded the Bill of Lading from Texas Company 1 to a representative of Russian Airline Company 1.

84. On or about November 28, 2022, PATSULYA emailed Texas Company 1 a copy of an "Export Compliance/End User Certification" in which PATSULYA falsely represented that he would "not export, re-export U.S. products, technology, or software to . . . . Russia . . . unless otherwise authorized by the United State[s] Government." The form was signed by PATSULYA on behalf of MIC.

85. On or about November 30, 2022, PATSULYA received copies of multiple forms that had to be filled out and signed for New York Company 1 before the units of the Goodrich Brake Assembly could be shipped out of the United States. One of the forms, entitled, "Re Compliance with United States Export Regulations," advised that the purchaser of the Goodrich Brake Assembly cannot (a) "sell, transfer, export, or re-export any [New York Company 1] products . . . to . . . Russia . . . or any other country on the United States Debarred List, unless otherwise authorized by the United States Government," and (b) that the purchaser would "obtain any licenses or approvals required by the United States Government prior to export or re-export of [New York Company 1] products . . . ." Another form, entitled, "Russia/Ukraine/Belarus Sanctions Certification," informed the purchaser of "the recent implementation of sanctions against Russia by the . . . United States, including, without any limitation, restrictions imposed by . . . the U.S. Department of Commerce, which has implemented new Russia license requirements and licensing policies for commercial aircraft components . . . ." These forms were later signed by an employee of a company based outside of the United States and then submitted to New York Company 1.

86.     On or about December 1, 2022, a CBP officer emailed a representative of New York Freight Forwarding Company 1, which was handling or coordinating transportation for the two brake units that were located at Texas Company 1. The CBP officer directed the representative of New York Freight Forwarding Company 1 to fill out a "Statement of Ultimate Consignee and Purchaser," also known as a BIS-711, and have the form signed by the ultimate consignee. The BIS-711 was a Department of Commerce form that requires the ultimate consignee for any item being exported out of the United States to provide accurate information about the final destination of the items and the intended use. BIS relied on the accuracy of BIS-711 forms to ensure proper enforcement of United States export laws and regulations.

87.     On or about December 2, 2022, PATSULYA was informed of the request to fill out the BIS-711 by the person that MIC used to coordinate logistics. Upon receiving this request, PATSULYA emailed it to others known and unknown to the Grand Jury and characterized the documents as "!!!! IMPORTANT." On or about December 5, 2022, PATSULYA circulated a version of the BIS-711 that he had filled out. This version listed Maldivian Company 1 as the Ultimate Consignee, but falsely listed PATSULYA as a representative of New York Company 1 and contained PATSULYA's signature.

88.     On or about December 5, 2022, a representative of New York Freight Forwarding Company 1 emailed a completed BIS-711 back to the CBP officer. The version of the BIS-711 form that the CBP officer received listed Maldivian Company 1 in the Maldives as the Ultimate Consignee, and bore the purported signature of an individual identified as the "General Manager" of Maldivian Company 1. The BIS-711 noted that the units of the Goodrich Brake Assembly would only be resold in the Maldives for use or consumption in that country.

89.     On or about December 7, 2022, BESEDIN, PATSULYA, and others known and unknown to the Grand Jury, were copied on an email discussing the status of various purchases, by MIC, of aircraft parts and components. The email subject header was

"PENDING update." The body of the email included the following: "1. Already paid," "2. Coordinate shipping," and "3. Update Excel." The email contained multiple attachments, one of which was an Excel spreadsheet. The spreadsheet showed multiple purchases of various airplane parts and components. The spreadsheet notated a purchase of two "brakes" from California Company 1 and had a status of "picked up."

90.     On or about January 3, 2023, a BIS agent emailed BESEDIN and asked about the identity of BESEDIN's customer for the two brake assemblies. In response, BESEDIN stated that his client was "an air company in the Maldives . . . ."

*Receipt of Order to Export Multiple Units of the Goodrich
Brake Assembly to Russian Airline Company 2*

91.     While PATSULYA and BESEDIN, and others known and unknown to the Grand Jury, worked to fulfill orders for multiple units of the Goodrich Brake Assembly from Russian Airline Company 1, they also received similar orders from Russian Airline Company 2, which, as described above and below, was the subject of a BIS temporary denial order.

92.     On or about September 15, 2022, Russian Airline Company 2 emailed unknown recipients a "(CRITICAL) BRAKES REQUEST" for ten sets of the Goodrich Brake Assembly. PATSULYA received this email and forwarded it to BESEDIN.

93.     On or about September 23, 2022, PATSULYA emailed a representative of Russian Airline Company 2 and said that he had four sets of the brakes with different wear levels that could be delivered to Moscow.

94.     On or about September 27, 2022, a representative of Russian Airline Company 2 emailed PATSULYA and advised that PATSULYA's prices were much higher than other suppliers. The same day, PATSULYA responded with the following: "Thank you very much for your response and the attached table with your prices. Please note that we are quoting you on the cost of the product based on DDP Moscow conditions . . . . Given the sanctions against the Russian Federation, the cost of spare parts, logistics,

and delivery time frames have gone up, in many instances there is a requirement to provide end user certificate, and we are taking care of these issues ourselves."

95.    On or about October 3, 2022, PATSULYA emailed a representative of Russian Airline Company 2 and said that he had six sets of the Goodrich Brake Assembly in stock and could deliver them to Moscow for $165,000.00 per set. That same day, the representative from Russian Airline Company 2 responded to PATSULYA with a purchase order.  The purchase order reflected a purchase by Russian Airline Company 2 from Turkish Company 1 of six sets of the Goodrich Brake Assembly for $165,000.00 each for a total of $990,000.00, delivery to Moscow.

96.    On or about October 10, 2022, one of PATSULYA's associates emailed representatives from Russian Airline Company 2 an invoice, copying PATSULYA on the email.  The individual copied PATSULYA on the email.  The invoice was on letterhead for Turkish Company 1 and reflected a purchase of six units of the Goodrich Brake Assembly for $165,000.00 each for a total of $990,000.00, delivery to Moscow.  The invoice had a "Purchase Order No." of P0967022.

97.    On or about October 10, 2022, a representative of Russian Airline Company 2 emailed PATSULYA and another individual, stating, "Attached is the document that I was talking about on the phone. I do not have information about other sanctions in regards to our company."   The attachment to the email was a copy of a June 24, 2022, press release issued by the BIS announcing the Temporary Denial Order for Russian Airline Company 2.

98.    Between on or about October 14, 2022, and October 24, 2022, PATSULYA negotiated with Russian Airline Company 2 the details of how Russian Airline Company 2 could send payment for the multiple units of the Goodrich Brake Assembly to PATSULYA from Russian Airline Company 2's bank account in Russia through Turkish Company 1's bank account in Turkey.  When PATSULYA and Russian Airline Company 2 ran into difficulties with transferring the money from Russian Airline 2's bank in Russia

to Turkish Company 1's bank in Turkey based on issues arising from international sanctions on Russia, they ultimately agreed to send the payment through Russian Company 1's bank account.

99. On or about October 24, 2022, Russian Airline Company 2 sent PATSULYA two purchase orders for seven units of the Goodrich Brake Assembly, both of which reflected the purchaser as Russian Airline Company 2 and the supplier as Russian Company 1. One purchase order, bearing Purchase Order No. "P0966222" reflected the purchase of one used, overhauled unit of the Goodrich Brake Assembly for $115,200.00. The second purchase order, bearing Purchase Order No. "P0967022" reflected the purchase of six new units of the Goodrich Brake Assembly for $198,000.00 each (for a total of $1,188,000.00).

100. Russian Airline Company 2 paid Russian Company 1 for seven units of the Goodrich Brake Assembly—one used unit for $115,200.00 and six new units for $198,000.00 each.

101. On October 27, 2022, a representative of Russian Airline Company 2 emailed PATSULYA. In the email, the representative advised that a "payment for brakes" pursuant to purchase order P0967022 was "scheduled for today." The next day, on October 28, 2022, a representative of Russian Airline Company 2 emailed PATSULYA advising that order P0967022 was paid. The next day, PATSULYA was copied on an email in which Russian Airline Company 2's payment for the brakes was confirmed.

102. On November 1, 2022, PATSULYA emailed himself an attachment. The name of the attached file contained the name of Russian Airline Company 2. The attachment was an invoice, bearing Invoice No. PI-0068-22, for four sets of the Goodrich Brake Assembly for a price of $187,216.00 each for a total of $748,864.00. The invoice showed MIC as the seller and shows Turkish Company 1 as the customer.

103. On November 2, 2022, an MIC bank account in the United States received a wire transfer in the amount of $368,228.00 from Turkish Company 1 using a Turkish bank

account. The notes accompanying the wire transfer reference the related purchase invoice, PI-0068-22.

104. On November 3, 2022, the bank account of MIC received a wire transfer in the amount of $380,592.00 from Turkish Company 1 using a Turkish bank account. The notes accompanying the wire transfer reference the related purchase invoice, PI-0068-22.

105. On December 7, 2022, a representative from Russian Airline Company 2 emailed PATSULYA and asked for an update on when the company could expect delivery of the brakes.

*Purchase of Multiple Units of the Goodrich Brake Assembly from Florida Company 1 and Attempted Export to Russia*

106. On or about December 8, 2022, Florida Company 1 offered to sell BESEDIN two units of Goodrich Brake Assembly for $118,000.00 each. BESEDIN responded on the same day that he wanted to buy both sets. BESEDIN then forwarded the email chain to others.

107. On or about December 8, 2022, BESEDIN again emailed Florida Company 1 with a Purchase Order for three units of the brake assemblies at $116,000.00 each for a total of $348,000.00. The Purchase Order reflected that the brake assemblies would be shipped to MIC in Sunny Isles Beach, Florida. Florida Company 1 provided a Pro Forma Invoice confirming the deal for the three units of the brake assemblies.

108. On or about December 12, 2022, Florida Company 1 emailed BESEDIN a new Pro Forma Invoice (bearing invoice number Q338504), which included an additional brake set for a total of four sets (serial numbers 2805, D0974, 1848, and 3988), at $464,000.00.

109. On or about December 14, 2022, BESEDIN and PATSULYA caused $348,000.00 to be wired from MIC's bank account to Florida Company 1's bank account. Two days later, on or about December 16, BESEDIN and PATSULYA caused an

additional $116,000.00 to be wired from MIC's bank account to Florida Company 1's bank account.

110. On or about December 20, 2022, BESEDIN informed Florida Company 1 that two of the brake assemblies he purchased were to be shipped to Maldivian Company 1 in the Maldives.

111. On or about December 21, 2022, BESEDIN received an email warning him that "there is attention for any MALDIVES shipment from CUSTOMS BORDER PROTECTION OF USA." On or about December 27, 2022, BESEDIN contacted Florida Company 1 and told them that the shipment of the two brake assemblies was no longer going to the Maldives, but instead it was going to Turkish Company 2. On December 28, 2022, Florida Company 1 issued a Commercial Invoice that reflected this change, namely that the four sets of brakes purchased by MIC would be shipped to Turkish Company 2.

112. On or about February 4, 2023, PATSULYA signed a BIS-711 on behalf of MIC-P&I, LLC. The BIS-711 form provided that the ultimate consignee for the shipment was Turkish Company 2 for "supply of own stock" and "future resale to local airlines."

*PATSULYA and BESEDIN's Interviews with BIS Agents in Boston and Phoenix*

113. On February 2, 2023, PATSULYA and BESEDIN participated in an interview with two BIS agents in Boston, Massachusetts, to discuss the shipments that had been detained.

114. During the interview, PATSULYA and BESEDIN were dishonest and deceitful in responding to questions from BIS about the end destinations and end users of the detained shipments. For example, when BIS asked PATSULYA and BESEDIN about MIC's clients, PATSULYA and BESEDIN told the agents that they only had two clients, Turkish Company 1 and Turkish Company 2. PATSULYA and BESEDIN told BIS that their two clients worked closely with aviation companies and airlines in Turkey.

115. At no time during the interview did PATSULYA or BESEDIN tell BIS that they had entered into agreements with Russian Airline Company 1 and Russian Airline

Company 2 to supply multiple units of the Goodrich Brake Assembly. Additionally, both PATSULYA and BESEDIN failed to tell BIS that they had received money from Russian Airline Company 1 and Russian Airline Company 2 in furtherance of the purchases of the multiple units of the Goodrich Brake Assembly. Rather, during the interview, PATSULYA and BESEDIN told BIS that they were aware of the sanctions on Russia and were mindful that the airline parts and components they purchased did not go there.

116. On May 11, 2023, PATSULYA and BESEDIN participated in another interview, this time with two BIS agents in Phoenix, Arizona, to discuss the shipments that had been detained.

117. During the interview, PATSULYA and BESEDIN were again dishonest and deceitful in responding to questions from BIS about the end destinations and end users of the detained shipments. PATSULYA and BESEDIN told the BIS agents that all of the detained shipments had been destined for Turkish Company 1 and Turkish Company 2 in Turkey. PATSULYA and BESEDIN falsely affirmed to the BIS agents that none of the detained shipments had been intended for final delivery to Russia.

118. All in violation of Title 18, United States Code, Section 371.

**COUNT TWO**
**Attempted Smuggling of Goods from the United States**
**(18 U.S.C. 554(a))**

119. The allegations contained in paragraphs 1 through 118 are realleged and incorporated herein as if fully set forth in this paragraph.

120. Starting on or about June 28, 2022, and continuing through at least September 25, 2022, in the District of Arizona and elsewhere, OLEG SERGEYEVICH PATSULYA and VASILII SERGEYEVICH BESEDIN, did fraudulently and knowingly attempt to export and send merchandise, namely multiple units of the Goodrich Brake Assembly, Part Number 2-1740-1, from the United States to Russia, contrary to the Export Control Reform Act, Title 50, United States Code, Section 4819, and the Export

Administration Regulations, Title 15, Code of Federal Regulations, Parts 730–774, laws and regulations of the United States.

121.     All in violation of Title 18, United States Code, Section 554(a).

## COUNT THREE
### Conspiracy to Violate the Export Control Reform Act
### (50 U.S.C. §§ 4819(a)(1), 4819(a)(2)(A)-(G), (J), 4819(b); 15 C.F.R. Parts 736.2(b)(1), (4), and (6), 746.8(a)(1))

122.     The allegations contained in paragraphs 1 through 121 are realleged and incorporated herein as if fully set forth in this paragraph.

123.     Beginning in or about May 2022 and continuing to on or about May 11, 2023, in the District of Arizona and elsewhere, OLEG SERGEYEVICH PATSULYA and VASILII SERGEYEVICH BESEDIN, together with others known and unknown to the Grand Jury, did knowingly and willfully conspire to export, attempt to export, and cause to be exported from the United States to Russia various aircraft parts and components including but not limited to multiple units of the Goodrich Brake Assembly, without first having obtained the required authorization and license from the United States Commerce Department.

124.     In violation of Title 50, United States Code, Sections 4819(a)(1), 4819(a)(2)(A)-(G), (J), and 4819(b); and Title 15, Code of Federal Regulations, Parts 736.2(b)(1), 736.2(b)(4), 736.2(b)(6), and 746.8(a)(1).

## COUNT FOUR
### Conspiracy to Commit International Money Laundering
### (18 U.S.C. §§ 1956(h), 1956(a)(2))

125.     The allegations contained in paragraphs 1 through 124 are realleged and incorporated herein as if fully set forth in this paragraph.

126.     Between in or about May 2022 and on or about May 11, 2023, within the District of Arizona and elsewhere, the defendants OLEG SERGEYEVICH PATSULYA and VASILII SERGEYEVICH BESEDIN, together with others known and unknown to

the Grand Jury, did knowingly combine, conspire, and agree with each other and with other persons known and unknown to the Grand Jury to commit offenses against the United States in violation of Title 18, United States Code, Section 1956, to wit: to transport, transmit and transfer and attempt to transport, transmit and transfer a monetary instrument and funds to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, that is, smuggling goods from the United States in violation of 18 U.S.C. § 554(a), all in violation of Title 18, United States Code, Section 1956(a)(2)(A).

127. All in violation of Title 18, United States Code, Section 1956(h).

## FORFEITURE ALLEGATION

128. The Grand Jury realleges and incorporates the allegations of Counts One through Four of this Indictment, which are incorporated by reference as though fully set forth herein.

129. Pursuant to Title 18, United States Code, Sections 981 and 982, Title 21, United States Code, Section 853, Title 28, United States Code, Section 2461(c), and Title 50, United States Code, Section 4819(d), and upon conviction of one or more of the offenses alleged in Counts One through Four of this Indictment, the defendants shall forfeit to the United States of America all right, title, and interest in (a) any property constituting, or derived from, or traceable to, any proceeds the persons obtained, directly or indirectly, as the result of the offense, and (b) any of the defendants' property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of such offense, including, but not limited to, a sum of money representing the amount of money involved in the offenses and the following property:

(1) A sum of money equal to at least $4,582,288.51 in United States currency, representing the amount of money involved in the offenses;

(2) At least $7,054.38 seized from MIC P&I, LLC's Chase account ending in -2003;

(3)     Approximately $21,000.58 seized from MIC P&I, LLC's Chase account ending in -6702;

(4)     2007 Sea Ray Sundancer 380 Cruiser, "Side Chick," with USCG Vessel Identification Number 1198232 and Hull Identification Number SERF1453L607; and

(5)     2023 BMW 740I, with Florida license plate 39DHCG and Vehicle Identification Number (VIN) WBA23EH05PCL79410.

130.    If any of the forfeitable property, as a result of any act or omission of the defendant(s):

(1)     cannot be located upon the exercise of due diligence,

(2)     has been transferred or sold to, or deposited with, a third party,

(3)     has been placed beyond the jurisdiction of the court,

(4)     has been substantially diminished in value, or

(5)     has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States to seek forfeiture of any other property of said defendants up to the value of the above-described forfeitable property, pursuant to Title 21, United States Code, Section 853(p).

/ / /

/ / /

/ / /

131.    All in accordance with Title 18, United States Code, Sections 981 and 982, Title 21, United States Code, Section 853, Title 28, United States Code Section 2461(c), Title 50, United States Code, Section 4819(d), and Rule 32.2, Federal Rules of Criminal Procedure.

A TRUE BILL

_s/_
FOREPERSON OF THE GRAND JURY
Date:  May 16, 2023

GARY M. RESTAINO
United States Attorney
District of Arizona

MATTHEW G. OLSEN
Assistant Attorney General
United States Department of Justice
National Security Division


_s/_
TODD M. ALLISON
WILLIAM G. VOIT
Assistant U.S. Attorneys

CHRISTOPHER M. RIGALI
Trial Attorney